## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| COREEN LYNNE MARIE OSBORNE, | CASE NO. 1:22-CV-02344-JG |
| Plaintiff, | DISTRICT JUDGE JAMES S. GWIN |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff Coreen Lynne Marie Osborne ("Plaintiff" or "Ms. Osborne") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

### I.      Procedural History

Ms. Osborne filed her DIB and SSI applications on June 16, 2020, alleging a disability onset date of March 13, 2020.  (Tr. 190, 197.)  She alleged disability due to multiple physical and mental impairments, including: multiple sclerosis testing, thoracic disc protrusion, osteoarthropathy, dextroscoliosis, levoscoliosis, migraines, kidney stones, depression, and anxiety (Tr. 86.)  Her application was denied at the initial level on December 9, 2020, and upon

1

reconsideration on May 7, 2021.  (Tr. 116, 121, 128, 133.)  She then requested a hearing and on

May 14, 2021, a telephonic hearing was held before an Administrative Law Judge ("ALJ").  (Tr.

28-46.)  The ALJ issued an unfavorable decision on February 2, 2022.  (Tr. 12-33.)  The Appeals

Council denied her request for review on November 2, 2022, making the ALJ's decision the final

decision of the Commissioner.  (Tr. 1-6.)  Plaintiff filed the pending appeal on December 31,

2022 (ECF Doc. 1), and the matter is fully briefed (ECF Docs. 7, 9, 10).

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Ms. Osborne was born in 1988 and was 32 years old on the alleged disability onset date,

making her a younger individual under Social Security regulations on the alleged onset date.

(Tr. 26.)  She has at least a high school education.  (*Id*.)  Ms. Osborne had not worked since

March 13, 2020, the alleged onset date.  (Tr. 17.)

### B.     Relevant Medical Evidence

#### 1.     Relevant Treatment History

##### i.     Physical Impairments

On June 15, 2020, Ms. Osborne presented to Adrienne R. Boissy, M.D., at the Mellen

Center for Multiple Sclerosis for a second opinion regarding neurological issues.  (Tr. 418-21.)

Ms. Osborne reported feeling numbness in her forearms and face in 2018 after a workout.  (Tr.

418.)  She also reported a migraine and said she felt as if she was going to pass out.  (*Id*.)  She

reported that her family doctor had ordered an MRI which "showed a few spots," but said she

was not officially diagnosed with multiple sclerosis ("MS").  (*Id.*)  She also reported back pain,

with no relief despite injections, pain management, and now physical therapy ("PT").  (*Id.*)  On

examination, Ms. Osborne's blood pressure was 122/75 and she weighed 250 pounds with a

2

body mass index (BMI) of 40.35.  (Tr. 420.)  Her physical examination was otherwise normal, with 5/5 strength of the upper and lower extremities, normal gait, and no signs of cerebellar dysfunction.  (Tr. 420-21.)  Dr. Boissy noted that prior MRIs were not suggestive of multiple sclerosis ("MS"), but ordered repeat studies to look for any changes.  (Tr. 421.)

Ms. Osborne underwent a sleep study on June 14, 2020, which was suggestive of moderate obstructive sleep apnea ("OSA").  (Tr. 597-602.)[1]  Ms. Osborne attended a virtual visit with Nancy Kempke, APRN, CNP, at the Cleveland Clinic Sleep Disorders Center on June 24, 2020.  (Tr. 596-604.)  CNP Kempke diagnosed her with moderate OSA and Ms. Osborne agreed to proceed with PAP therapy.  (Tr. 604.)  An order was submitted for an AutoCPAP.  (*Id.*)

On June 29, 2020, Ms. Osborne underwent an MRI of the brain, cervical spine, and thoracic spine.  (Tr. 607-42.)  The radiologist's impression was:

> Interval development of multiple supratentorial white matter T2/FLAIR signal abnormality seen in distribution suggesting demyelinating disease such as multiple sclerosis. No corresponding enhancement. No acute intracranial findings.

> Possible intramedullary signal abnormalities at C4-5 and C5-6 only seen on axial motion degraded T2 sequences, no corresponding enhancement or corresponding findings on sagittal sequences. Findings may represent artifact versus demyelinating plaques. Remaining visualized spinal cord demonstrates normal morphology and signal intensity. No mass or pathologic intradural enhancement. No significant degenerative changes involving cervical and thoracic spine.

(Tr. 617-18.)

Ms. Osborne also attended an office visit with primary care provider Colleen Staszak, DO, at University Hospitals on June 29, 2020.  (Tr. 782-85.)  Her diagnoses included polycystic ovarian syndrome ("PCOS") and hidradenitis suppurativa ("HS").  (Tr. 782.)  Her examination findings were normal, except that her BMI was 41.32.  (Tr. 785.)  Dr. Staszak noted no significant rash or lesions.  (*Id.*)

---

[1] It appears a subsequent interpretation of the same study results found mild obstructive sleep apnea.  (Tr. 1547-51.)

Ms. Osborne returned to see Dr. Boissy at the Mellen Center on July 13, 2020.  (Tr. 588-90.)  Dr. Boissy diagnosed Ms. Osborne with relapsing remitting MS based on her new MRI findings.  (Tr. 590.)  While Ms. Osborne continued to report significant back pain, Dr. Boissy explained this was "likely not directly related [to] the MS and possibly more mechanical in nature." (*Id*.)  Dr. Boissy recommended another MRI in six months, at which time disease modifying therapy would be discussed if the MRIs showed new lesions.  (*Id*.)

Ms. Osborne returned to see Dr. Boissy a month later, on August 24, 2020, complaining of a warm sensation when laying down and some numbness in the fingers of her left hand.  (Tr. 677-79.)  Her examination findings were normal.  (Tr. 678-79.)  She was well-appearing, alert, and in no acute distress.  (Tr. 678.)  She demonstrated normal strength, a normal gait, normal tandem walking, and independent ambulation.  (Tr. 678-79.)  Ms. Osborne was given education on Copaxone and Avonex and referred for an EMG given the ongoing concern of numbness in the left hand.  (Tr. 679.)  She was advised to see her primary care provider regarding her back pain, which was "not likely MS related," and to follow up in six months.  (*Id.*)

On August 31 and September 24, 2020, medical records indicate that Ms. Osborne's CPAP usage was less than 50%.  (Tr. 713, 714.)  Telephone messages were left to remind her of "PAP compliance guidelines per insurance."  (*Id.*)  On October 27, 2020, her CPAP usage was less than 70%, and another telephone message was left regarding PAP compliance.  (Tr. 712.)

Ms. Osborne attended an office visit with her primary care provider, Dr. Staszak, on November 19, 2020, complaining of headaches and MS.  (Tr. 776-81.)  Her examination findings were generally normal, with clear lungs, full range of motion of her neck, no significant rash or lesions, and a normal mood and affect.  (Tr. 780.)  Dr. Staszak started her on Baclofen for back pain / muscle spasm and Promethazine HCl for nausea, and continued her on Topiramate for

episodic tension-type headache, Albuterol Sulfate for health maintenance, and Duloxetine HCl and Spironolactone for PCOS. (Tr. 776-77.)

Ms. Osborne underwent a repeat MRI of the brain on January 4, 2021. (Tr. 715-20.) The impression was: "Multiple intracranial white matter lesions compatible with multiple sclerosis. No new T2 lesions and no new enhancing lesions. No significant parenchymal volume loss." (Tr. 719-20.) Ms. Osborne followed up with Dr. Boissy at the Mellon Center on that same date, complaining of some burning in her hands and continued numbness; she also complained of cramping in her forearm and calf. (Tr. 709-11.) She was not yet on disease modifying therapy. (Tr. 710.) Her physical examination findings were normal. (Tr. 710-11.) Dr. Boissy noted that there were no new lesions in her MRI findings, and that she was ready to start Copaxone, an injectable treatment for MS, as discussed. (Tr. 709, 711.) She was instructed to follow up with a new MRI and office visit in six months. (Tr. 711.)

On February 4, 2021, Ms. Osborne attended an appointment with Shaza Daoud, M.D., at Glo Dermatology, complaining of "dry patch and boils." (Tr. 733-34.) On examination, she was observed to have "2 [hidradenitis suppurativa] bumps on the R[igh]t and left groin areas." (*Id.*) Dr. Daoud diagnosed: "Hidradenitis, in groin area, currently in remission, not active lesions, only scars, noted to have one inflamed." (*Id.*) Ms. Osborne received a Kenalog injection. (*Id.*)

Ms. Osborne attended a follow-up appointment with Kathleen A. Harris, CNP, at the Mellen Center on March 5, 2021. (Tr. 746-50.) She reported feeling stable since her last appointment and tolerating Copaxone without side effects, except that she had "lumps/welts on her legs from the injections." (Tr. 746.) She also complained of intermittent headaches since hitting her head three to four weeks prior; she was taking Excedrin, which helped mildly. (Tr. 747.) Her physical examination findings remained normal. (Tr. 748-49.) CNP Harris assessed

her MS as "clinically and radiographically stable on Copaxone." (Tr. 749.) She ordered a head CT in light of Ms. Osborne's fall, instructed Ms. Osborne to continue Copaxone with site rotations, and scheduled an MRI of the brain in July 2021. (Tr. 750.) The head CT scan was completed on that same date, and showed grossly stable appearance of multifocal white matter disease consistent with a history of MS. (Tr. 754.)

Ms. Osborne presented to Peter R. Rahael, MD, in the emergency room at Cleveland Clinic in Lakewood on March 11, 2021, complaining of an "abscess to the right thigh/groin" starting the day before. (Tr. 741-45.) Physical examination revealed a lesion but "[n]o abscess or erythema" and swelling and tenderness to the right upper leg, with no edema, deformity, lacerations or bony tenderness. (Tr. 744-45.) Her speech was tangential and her behavior was hyperactive. (Tr. 744.) Other physical and mental examination findings were normal. (Tr. 744-45.) Dr. Rahael's clinical impressions were anxious mood and inclusion cyst. (Tr. 745.) Ms. Osborne was advised to follow up with her primary care provider. (*Id.*)

On March 14, 2021, Ms. Osborne attended an office visit with Steven Suess, MD, at University Hospitals for an abscess on her right groin. (Tr. 1628-31.) She had presented to the emergency room four days earlier for the same issues and "had more pain since then." (Tr. 1629.) The physical exam portion of her records from this visit stated:

> Right groin has a greater than 2 inch diameter abscess which was draining brown discharge with little odor to it. Gentle pressure was applied to the edges of this abscess and large amounts of discharge were expressed. By completion of the pressure the wound was less than 1 inch in diameter. There was little to no discharge or anything to express after the gentle pressure was applied. Skin changes are consistent with hidradenitis. She felt somewhat better afterwards.

(Tr. 1631.) Dr. Suess prescribed Doxycycline Hyclate and Tramadol as needed for pain, and referred Ms. Osborne to general surgery for evaluation and treatment. (Tr. 1628.)

Ms. Osborne attended preventative health examination with Dr. Staszak on March 19, 2021, reporting no concerns but complaining of hot flashes, night sweats, and flushing.  (Tr. 771-75.)  Physical examination findings were normal, except for an abscess of the right groin.  (Tr. 774-75.)  Dr. Staszak assessed acute sinusitis, cold sore, and flushing.  (Tr. 771.)

Ms. Osborne presented for "evaluation of hidradenitis suppurativa on her right inguinal region" with Dr. Pamela Ng at Cleveland Clinic Dermatology on April 13, 2021.  (Tr. 1571-75.) She reported that the problem had been going on for years, and was previously treated with intralesional Kenalog, which "did not help."  (Tr. 1571.)  She reported the area had recently gotten infected and she had to have it drained in the hospital.  (*Id.*)  Dr. Ng performed a full skin exam, including the scalp, face, neck, chest, abdomen, back, buttocks, arms and legs.  (Tr. 1574-75.)  She noted: "Right inguinal region with a couple open comedones and a couple subcutaneous nodules. No significant erythema or drainage.  Axilla are clear." (*Id.*)  Dr. Ng diagnosed hidradenitis suppurativa, Hurley Stage I, and prescribed Hibilens 1-2 times per day and Clindamycin gel twice daily.  (Tr. 1575.)  Ms. Osborne was instructed to return in one year, sooner if she had a flare.  (*Id.*)

On April 21, 2021, Ms. Osborne reported to Dr. Edward D. Fine that her OSA symptoms had been present for many years and were unchanged, and that she was unable to use the CPAP due to mask issues.  (Tr. 1547.)

Ms. Osborne attended an office visit with primary care provider Dr. Staszak on May 24, 2021, for multiple medical conditions.  (Tr. 1637-41.)  On examination, Ms. Osborne was in no acute distress, had full range of motion of the neck, and had no significant rash or lesions.  (Tr. 1640-41.)  Dr. Staszak prescribed new medications for back pain and episodic tension-type

headaches, and ordered an x-ray of the thoracic spine.  (Tr. 1637.)  The x-ray revealed mild discogenic degenerative changes throughout the thoracic spine.  (Tr. 1645.)

Ms. Osborne attended a dermatology appointment with Dr. Ng on June 8, 2021, complaining of a recent flare a week prior on her "left inner thigh, and right groin area"; she was using Hibiclens and clindamycin gel.  (Tr. 1461-64.)  Her examination revealed a "cystic nodule" on the left medial thigh and a "sinus opening" on the right medial thigh.  (Tr. 1463.)  Dr. Ng noted that Ms. Osborne's HS was flaring, administered intralesional Kenalog, and added doxycycline.  (*Id.*)  She instructed Ms. Osborne to return in three months.  (Tr. 1464.)

Ms. Osborne attended a follow-up visit with Marisa McGinley, DO, at the Mellen Center for Multiple Sclerosis on June 28, 2021.  (Tr. 1249-53.)  She reported that Copaxone was okay initially, but that she had discontinued it due to side effects and had been off MS modifying therapy for a month.  (Tr. 1249, 1253.)  Her physical examination findings were normal, except that her weight was 280 pounds and her BMI was 45.16.  (Tr. 1251-52.)  Dr. McGinley ordered updated MRI imaging and labs prior to choosing another disease modifying therapy.  (Tr. 1253.)  She also referred Ms. Osborne to pain management to discuss options for mid-thoracic pain that was "more likely musculoskeletal related than MS."  (*Id.*)

On August 2, 2021, Ms. Osborne attended an initial evaluation for her upper back with Joseph Abdelmalak, MD, at Fairview Pain Management.  (Tr. 1178-83.)  Her examination findings were normal, except she was noted to be obese with tenderness over the bilateral lumbar and thoracic paraspinal muscles.  (Tr. 1182.)  She reported that she was taking Topamax, Ibuprofen, and Wellbutrin.  (*Id.*)  Dr. Abdelmalak diagnosed chronic midline thoracic back pain, MS, myofascial muscle pain, and obesity, class II.  (*Id.*)  He instructed Ms. Osborne to continue

8

her current medications, consider bilateral thoraco-lumbar paraspinal trigger point injections, and consult with PT; he also recommended a weight loss program.  (Tr. 1183.)

MRIs of Ms. Osborne's brain and cervical spine were stable on August 12, 2021, with no new lesions detected.  (Tr. 1151-56.)  Ms. Osborne attended a follow-up appointment with Shauna M. Gales, PA-C, at the Mellen Center on that same date.  (Tr. 1127-31.)  She was still not on disease modifying treatment and reported feeling stable overall.  (Tr. 1127.)  However, she reported episodes of intermittent blurred vision, tremors in both hands that did not affect daily function, and episodes of not tasting or smelling foods.  (*Id.*)  Her examination findings remained normal.  (Tr. 1129-30.)  PA Gales discussed treatment options with Ms. Osborne, who agreed to consider Vumerity vs. Ocrevus and follow up in one month.  (Tr. 1131.)

On August 16, 2021, Ms. Osborne received a bilateral thoracolumbar paraspinal muscle trigger point injection.  (Tr. 1100-03.)

Ms. Osborne attended a virtual visit with PA Gales at the Mellen Center on September 13, 2021.  (Tr. 1069-71.)  She reported no new neurological symptoms, but reported continued vision changes, with no change since August.  (Tr. 1069.)  She also reported right knee pain, and that her thoracolumbar paraspinal trigger point injection had not improved her pain.  (*Id.*)  She complained of moderate fatigue.  (*Id.*)  Ms. Osborne wanted to proceed with IV Ocrevus treatment, which would require prior authorization and clearance from hematology.  (Tr. 1071.)  Ms. Osborne was instructed to consult hematology and follow up in November.  (*Id.*)

Ms. Osborne presented for a dermatology appointment with Dr. Ng on September 15, 2021, complaining of a recent flare in her groin area.  (Tr. 1042-45.)  She complained of a painful lump on her right anterior thigh near the inguinal region, but also reported that she had stopped taking doxycycline after one month, without filling the two refills, and that she was

unable to get Hibiclens due to cost; she was using clindamycin gel.  (Tr. 1042.)  On examination, Dr. Ng noted an "oblong cystic plaque" affecting the right anterior thigh "near the inguinal region."  (Tr. 1044.)  Ms. Osborne was instructed to restart doxycycline once she finished azithromycin, use a benzyl peroxide wash 1-2 times per day, and to continue clindamycin gel twice daily.  (Tr. 1045.)

On September 21, 2021, hematologist Seema Misbah, M.D., offered the opinion that Ms. Osborne's neutrophilic leukocytosis was most likely related to her daily vaping and heavy secondhand smoke exposure.  (Tr. 988-93, 1005-06.)

### ii.    Mental Impairments

Ms. Osborne reported depression at her neurological evaluation on June 15, 2020.  (Tr. 421.)  She said she was receiving psychiatric medications from her primary care provider but would be interested in talking to someone.  (*Id.*)  Dr. Boissy referred her to psychiatry.  (*Id.*)

Ms. Osborne attended a primary care appointment with Dr. Staszak on June 29, 2020, where she renewed her prescription for Alprazolam for anxiety.  (Tr. 782.)  Her anxiety was stable, but she reported worsening depression.  (Tr. 783.)  Following Ms. Osborne's MS diagnosis on July 13, 2020, Dr. Boissy again recommended she meet with psychiatry.  (Tr. 590.)

Ms. Osborne continued to complain of anxiety and depression at her next primary care visit on November 19, 2020.  (Tr. 776-77.)  Dr. Staszak started her on Lorazepam.  (Tr. 776.)

At a January 4, 2021 follow-up appointment with Dr. Boissy, Ms. Osborne's mental examination findings were normal, except that she was depressed.  (Tr. 710-11.)  Dr. Boissy noted she had not yet made a psychiatric appointment; her referral was still pending.  (Tr. 711.)

Ms. Osborne attended a psychological evaluation with Alexa Kane, Psy.D., on January 5, 2021.  (Tr. 703-08.)  She reported that both of her parents were disabled; her mother reportedly

10

suffered a brain aneurysm, stroke, and heart attack when she was 16 years old, and her father had

a brain aneurysm and stroke.  (Tr. 705.)  She continued to live at home and care for her parents.

(*Id.*)  She complained of chronic depression with intermittent major depressive episodes, and

endorsed passive suicidal ideation but denied plan and intent.  (Tr. 707.)  Her mental status

examination findings were largely normal, except that she was sad and tearful.  (*Id.*)  She was

diagnosed with persistent depressive disorder with intermittent major depressive episodes,

moderate.  (Tr. 708.)  Dr. Kane referred her to psychiatry for medication management and

scheduled a health psychology follow up in three weeks.  (*Id.*)

Ms. Osborne began supportive therapy with Dr. Kane on January 26, 2021.  (Tr. 700-02.)

On mental status examination, she was tearful but well-groomed and oriented to person, place,

time, and situation, with appropriate behavior, full affect, and appropriate insight and judgment.

(Tr. 701-02.)  She was instructed to follow up in one month.  (Tr. 702.)

Ms. Osborne returned for monthly supportive therapy and cognitive behavioral therapy

appointments with Dr. Kane on March 2, April 1, May 6, June 29, and July 13, 2021.  (Tr. 750-

52, 1202-03, 1232-33, 1528-29, 1615-16.)  Her mood and/or affect ranged from normal to flat to

angry, but other mental status findings were normal, except that her social relatedness was

melancholic in June 2021.  (Tr. 751, 1203, 1233, 1529, 1616.)  She sometimes discussed

beginning medication management with psychiatry, but did not initiate such treatment.  (*Id.*)

On May 24, 2021, primary care provider Dr. Staszik extended Ms. Osborne's

benzodiazepine prescription for anxiety.  (Tr. 1637-41.)

On August 9, 2021, Ms. Osborne attended a holistic psychiatric intake with Margo Davis,

LISW.  (Tr. 1167-70.)  On mental status examination, her mood was anxious and distressed, her

affect was tearful, and she demonstrated passive suicidal ideation.  (Tr. 1167.)  Other mental

11

status findings were unremarkable, including normal grooming, full orientation, calm and cooperative attitude, goal directed and logical thoughts, intact memory, and good insight and judgment.  (*Id.*)  Ms. Osborne was agreeable to work with LISW Davis on developing her self-care, engaging in healthy coping skills, and working on her self-esteem.  (Tr. 1170.)

At a neurology appointment on August 12, 2021, Ms. Osborne's mood was good/bright. (Tr. 1128.)  She reported recently stopping Cymbalta and Wellbutrin, and starting Zoloft a month before; she also continued on Xanax, prescribed by her primary care provider.  (*Id.*)

Ms. Osborne attended holistic psychiatric treatment visits with LISW Davis on September 13, September 20, and October 11, 2021.  (Tr. 969-70, 1024-25, 1078-79.)  On mental status examination, LISW Davis noted Ms. Osborne was oriented, calm, and cooperative, with a depressed or anxious mood and a flat, tearful, or reactive affect; other mental status findings were unremarkable.  (Tr. 969. 1024, 1078.)

### 2.    Opinion Evidence

#### i.    Consultative Examination

Ms. Osborne presented to Michael Faust, Ph.D., for a state agency-referred consultative examination regarding her mental functioning on November 23, 2020.  (Tr. 685-92.)  She reported that she was limited in her ability to work due to "[i]nability to concentrate, shakiness, weird dizziness, constant pain, headaches, migraines and vertigo."  (Tr. 686.)  She was living with her parents, who were both disabled.  (*Id.*)  She reported a medical history of back problems, sleep apnea, chronic migraines, headaches, kidney stones and chronic fatigue, and said she was trying to use a C-PAP machine but it was "very difficult."  (Tr. 687.)  She was receiving mental health medications from her primary care provider and had tried counseling for one month a couple of years prior.  (*Id.*)  She complained of depression, anxiety, and panic.  (*Id.*)

Ms. Osborne was cooperative and polite on mental status examination, and appeared motivated to complete the examination with good effort.  (Tr. 688.)  She responded to questions with detailed but simplistic answers.  (*Id.*)  Her affect was full and she was pleasant but passive and pensive.  (Tr. 689.)  She was fully oriented and understood the purpose of the examination. (*Id.*)  Her thinking appeared logical and linear, but also simple and concrete. (*Id.*)  She had no difficulty understanding simple questions and her speech was normal, but she exhibited fairly simplistic speech patterns.  (*Id.*)  She had some difficulty understanding complex instructions and gave up easily on tasks she viewed as challenging.  (Tr. 690.)  She made consistent eye contact but became sad during the session and appeared fatigued and slow moving.  (Tr. 689.) She showed an adequate frustration tolerance, with no evidence of attention deficits, but gave up easily at tasks during the examination.  (*Id.*)  Clinical observations and Ms. Osborne's history were consistent with low average intellectual functioning.  (*Id.*)  She reported handling her own money and paying her bills.  (*Id.*)  Her social judgment was simplistic.  (Tr. 690.)

Dr. Faust diagnosed Ms. Osborne with persistent depressive disorder.  (Tr. 692.)  Based on his examination, he reported that Ms. Osborne "presented with no significant difficulties interacting although she was rather passive with an underlying sadness and frustration over her struggle with her health."  (Tr. 690-91.)  He noted that she reported some difficulty with persistent depressive symptoms, and found her presentation "consistent with a diagnosis of a persistent depressive disorder, which continues to impact upon her daily functioning."  (Tr. 691.) He also noted that she reported working full time for ten years "[d]espite her ongoing depressive symptoms for many years," and that "she stressed that her primary disability is related to her health issues[.]"  (*Id.*)

13

Considering Ms. Osborne's limitations in the four categories of mental functioning, Dr. Faust made the following findings:

**The claimant's mental abilities and limitations in understanding, remembering and carrying out instructions.**

Ms. Osborne is estimated to be functioning within the low average range of intellectual ability. No psychometric measures were ordered over the course of this evaluation and no past test results or school records were provided for my review. She reported that she received regular education instruction and graduated in 2006. From clinical observations and history, Ms. Osborne does not exhibit any intellectual or learning disorders which would limit understanding; however, she can be expected to experience some difficulty with remembering and following through on instructions secondary to her persistent depressive disorder, which results in limited motivation, concentration and attention deficits, and social withdrawal.

**The claimant's mental abilities and limitations in maintaining attention and concentration, persistence and pace to perform tasks and to perform multi-step tasks.**

Ms. Osborne did appear to exhibit mild inattention at times, but I strongly believe this is related to her depressive disorder. In sum and based on his performance in this interview, Ms. Osborne is viewed to have some limitations in attention and concentration, as well as with persistence and work pace related to a persistent depressive disorder.

**The claimant's mental abilities and limitation in responding appropriately to supervision and to coworkers in a work setting**

Ms. Osborne was passive, depressed and somewhat anxious during the interview, but she remained polite and answered all questions. She remained very cooperative throughout the session. She reported no difficulty getting along with coworkers in her employment history. In sum, Ms. Osborne is currently viewed to have some limitations with regard to responding appropriately to supervision or to coworkers in an employment setting due to a persistent depressive disorder, which results in social withdrawal and lack of motivation to interact with others.

**The claimant's mental abilities and limitations in responding appropriately to work pressures in a work setting.**

Ms. Osborne presented as depressed, but she did not present as psychotic. From a psychological perspective, Ms. Osborne is viewed to have limitations in her ability to respond appropriately to work pressures in an employment setting due to symptoms associated with a persistent depressive disorder. She said that she remains depressed and is more withdrawn and depressed. She discussed that she

tries to do light household chores during the days, but has little motivation to do much of anything. She can be expected to experience some difficulty withstanding the stress and pressures of working due to the chronic depressive symptoms; however, she was working full time until April 2020 at a position she had held for ten years. She said that she quit this job due to problems with her boss and also described significant medical issues due to kidney stone removals in both April and May 2020. Again, she stressed that her primary disability is related to her health issues and this should be evaluated by a medical professional.

Ms. Coreen Osborne does appear to have the mental ability to manage her funds if she is awarded benefits.

(Tr. 691-92.)

### ii.    Treating Provider Questionnaire

Ms. Osborne's treating psychologist, Dr. Kane, completed a mental impairment questionnaire on July 13, 2021.  (Tr. 795-96.)  She reported treating Ms. Osborne monthly for six months, with diagnoses of persistent depressive disorder with intermittent major depressive episodes, moderate, and multiple sclerosis.  (Tr. 795.)  She indicated that Ms. Osborne's persistent depressive disorder was "likely to be a chronic and lifelong concern."  (*Id.*)  In the check-box questionnaire, Dr. Kane wrote that she was "not able to assess" Ms. Osborne in nearly every category of limitation, including limitations relating to sustained concentration and persistence, understanding and memory, social interaction, and adaptation.  (Tr. 795-96.)  She was also unable to assess how often Ms. Osborne's impairments or treatment would cause her to be absent from work or off task.  (Tr. 796.)  However, she did check boxes indicating that Ms. Osborne was "[s]eriously limited, but not precluded" from carrying out very short and simple instructions (Tr. 795), and "[u]nable to meet competitive standards" in interacting appropriately with the general public (Tr. 796).

### 3.    Function Reports

Ms. Osborne completed a function report on July 29, 2020.  (Tr. 238-242.)  In it, she reported that her illnesses, injuries, or conditions limited her ability to work for the following

reasons: "I experience continuous pain throughout my body along with intense migraines on a daily basis.  I fatigue easily and experience depression and anxiety.  I was recently diagnosed with multiple sclerosis which may be contributing to these ailments."  (Tr. 234.)  She also reported living with her parents, leaving the house about twice a week for appointments, preparing simple meals and doing her own laundry.  (Tr. 38-41.)  In the remarks section, Ms. Osborne provided a typed letter in which she addressed worsening symptoms, treatment for MS, and bi-weekly appointments with a psychologist.  (Tr. 242.)

### 4.    State Agency Reviewers

State agency psychological reviewer Courtney Zeune, Psy.D., determined on initial review that Ms. Osborne had the mental residual functional capacity to:

> understand and remember simple to moderately complex tasks in a work setting; sustain attention and concentration on simple to moderately complex tasks in a work setting; sustain superficial interactions with the general public; and adapt to a work setting in which duties are routine and predictable, and in which she is not expected to adhere to strict production standards.

(Tr. 71-72, 81-82.)  On reconsideration, state agency psychological reviewer Vicki Warren, Ph.D., concurred with Dr. Zeune's findings.  (Tr. 94-95, 106-07.)

State agency medical consultant Dana Shultz, M.D., determined on initial review that Ms. Osborne can: work at the light exertional level; occasionally climb ramps and stairs, but never climb ladders, ropes, and scaffolds; frequently perform fine manipulation with the left upper extremity; and should avoid all exposure to hazardous machinery and unprotected heights.  (Tr. 69-70, 79-80.)  On reconsideration, state agency medical consultant Rannie Amiri, M.D., found Dr. Shultz's limitations were not fully consistent, as additional postural limitations were supported by Ms. Osborne's spinal impairment, but left upper extremity limitations did not correlate with objective physical examination findings.  (Tr. 94, 106.)  Dr. Amiri did not adopt

any manipulation limitations but found the following additional limitations appropriate: frequently balance, kneel, and crouch; occasionally stoop and crawl; and avoid concentrated exposure to extreme heat.  (Tr. 92-94, 104-06.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

At the December 16, 2021 telephonic hearing, Ms. Osborne testified in response to questions posed by the ALJ and her counsel.  (Tr. 36-61.)  At the time of the hearing, she was living with her parents.  (Tr. 46.)

Responding to questions related to why she felt she could not work full time, Ms. Osborne described "constant pain" which she believed prevented her from working.  (Tr. 42.) She testified that her back pain, migraines, and hidradenitis suppurativa were the primary sources for her pain.  (*Id.*)  She also testified to depression and trouble concentrating.  (*Id.*)  She reported that back pain, migraines, leg pain and trouble concentrating were the problems that she was experiencing when she stopped working in 2020.  (Tr. 44.)  While testifying, Ms. Osborne expressed that she had difficulty finding her words, and was also nervous.  (Tr. 43.)

When asked about her fatigue, Ms. Osborne testified that she was "pretty much always tired," and experienced fatigue more acutely when showering.  (Tri. 45-46.)  She said she spent most days watching TV but could do light chores like heating a can of soup and occasional laundry.  (Tr. 46.)  She also reported trouble sleeping and confirmed that she was unable to tolerate a CPAP machine for her sleep apnea.  (Tr. 47-48.)

Regarding her hidradenitis suppurativa, Ms. Osborne testified that her condition had not improved since it started in early 2021.  She reported "it never goes away completely," but that "the severeness of it fluctuates like in different spots but it's always there and they always hurt."

(Tr. 49.)  She confirmed that the condition is present in her inguinal area (Tr. 49-50) and that she treats it with both oral antibiotics and antibiotic gel (Tr. 50).

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination, could not perform Ms. Osborne's prior work, but could perform representative positions in the national economy, including garment sorter, marker, or odd piece sorter.  (Tr. 55-56.)  He also testified that it would preclude competitive employment if the hypothetical person would either be off task 10% of the workday or absent more than one day per month.  (Tr. 56.)

In response to questioning from defense counsel, the VE testified that all jobs have production standards, but with "jobs that are not on a set schedule such as a production line, there's generally end-of-day goals that are set forth for individuals."  (Tr. 57.)  When counsel conflated the term "production standards" with the term "strict production standards," the ALJ counseled him not to put words in the VE's mouth.  (Tr. 57-58.)  The VE explained that "strict goals are generally on production lines where you have no control over the pace and amount of items coming that need to be completed on your line."  (Tr. 58.)  In describing the difference between production goals and "strict" production goals, he explained: "the difference is where you have a job that you have to have a certain pace that you can't control as opposed to items that you're supposed to complete or task[s] to complete on your own, basically your own timeframe."  (Tr. 58-59.)

Defense counsel also noted that the three representative jobs identified by the VE contained "an R temperament" in the Dictionary of Occupational Titles ("DOT"), which he said pertains to "performing repetitive work or performing continuously the same work . . . according

18

to set procedures, sequence, and pace." (Tr. 59.)  The ALJ responded that he read the DOT definition differently than counsel, and noted the VE had given representative jobs he believed fit the hypothetical. (*Id.*)  Counsel objected to the representative jobs given by the VE, arguing that jobs with an "R temperament" are inconsistent with "that." (Tr. 60.)  Although the language of counsel's objection was somewhat vague, it appears he was arguing that an "R temperament" is inconsistent with the requirement in the RFC that the hypothetical individual "not [be] expected to adhere to strict production standards such as high piece rate work." (Tr. 54.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed

impairment, the claimant is presumed disabled without further inquiry.

4.     If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.     If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In his September 1, 2020 decision, the ALJ made the following findings:[2]

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.  (Tr. 17.)

2.     The claimant has not engaged in substantial gainful activity since March 13, 2020, the alleged onset date.  (*Id.*)

3.     The claimant has the following severe impairments: multiple sclerosis, obstructive sleep apnea, morbid obesity, migraines, hidradenitis, unspecified thoracic, thoracolumbar, and lumbosacral intervertebral disc disorder, generalized anxiety disorder, and persistent depressive disorder with intermittent major depressive disorder.  (*Id.*)

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments

---

[2] The ALJ's findings are summarized.

in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (Tr. 18.)

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except with the following specific limitations: Occasional climbing of ramps and stairs, never ladders, ropes and scaffolds; frequent balancing, occasional stooping, frequent kneeling and crouching, occasional crawling , avoid concentrated exposure to extreme heat, all exposure to hazards such as heights and machinery. Can understand and remember simple to moderately complex tasks in a work setting, can sustain attention and concentration on simple to moderately complex tasks in a work setting, can sustain superficial interactions with the general public, and can adapt to a work setting in which duties are routine and predictable and in which she is not expected to adhere to strict production standards - such as high piece rate work. (*Id*.)

6.     The claimant is unable to perform any past relevant work. (Tr. 26.)

7.     The claimant was born in 1988 and was 32 years old, defined as a younger individual age 18-49, on the alleged disability onset date. (*Id*.)

8.     The claimant has at least a high school education. (*Id*.)

9.     Transferability of job skills is not material to the determination of disability. (*Id*.)

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including garment sorter, marker, and checker. (Tr. 26-27.)

Based on the foregoing, the ALJ determined that Ms. Osborne had not been under a disability, as defined in the Social Security Act, from March 13, 2020, through the date of the decision on February 2, 2022. (Tr. 27.)

### V.     Plaintiff's Arguments

Ms. Osborne presents the following four arguments: (1) the ALJ committed harmful error at Step Three when he failed to find that Ms. Osborne satisfied the listing criteria for hidradenitis suppurativa; (2) the ALJ committed harmful error at Step Three when he failed to properly

evaluate Ms. Osborne's multiple sclerosis in combination with her psychological impairments and fatigue; (3) the ALJ committed harmful error when he failed to properly apply the criteria of Social Security Ruling 16-3p and found that the effect of the combination of Ms. Osborne's symptoms allowed her to engage in substantial gainful activity on a full-time and sustained basis; and (4) the ALJ erred at Steps Four and Five when he found that the opinion of the VE was consistent with the Dictionary of Occupational Titles.  (ECF Doc. 7, p. 1.)

## VI.    Law & Analysis

### A.    Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a

zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.**   **First Assignment of Error: Whether the ALJ Erred by Finding Ms. Osborne Did Not Meet Listing 8.06**

Ms. Osborne argues that the ALJ erred in finding her skin impairment did not meet the requirements of Listing 8.06.  (ECF Doc. 7, pp. 9-10.)  In support, she argues "the ALJ failed to evaluate any evidence documenting Plaintiff's continuing outbreaks from March 2021 through September 2021 for her hidradenitis suppurativa." (*Id.* at p. 10.)  She also argues that "Listing 8.06 does not require that person to have problems ambulating," but "[t]he continuing lesions limited her ability to stand and walk directly related to the associated pain." (ECF Doc. 7, pp. 9-

10.)    The Commissioner argues in response that the ALJ properly found there was insufficient evidence to satisfy the requirements of Listing 8.06 in this case.  (ECF Doc. 9, p. 10.)

At Step Three of the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii).  The claimant bears the burden of establishing that her condition meets or equals a listing.  *Johnson v. Colvin*, No. 1:13CV-00134-HBB, 2014 WL 1418142, at *3 (W.D. Ky. Apr. 14, 2014) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d); *Buress v. Sec'y of Health and Human Serv'*s., 835 F.2d 139, 140 (6th Cir. 1987)).  Furthermore, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin*., 93 Fed. App'x 725, 728 (6th Cir. 2004).

At the time of the ALJ decision, hidradenitis suppurativa was addressed in Listing 8.06, which required "extensive skin lesions involving both axillae, both inguinal areas or the perineum that persist for at least 3 months despite continuing treatment as prescribed."  20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 8.06 (2023) (current through Oct. 6, 2023; *see* 88 Fed. Reg. 37704 (June 8, 2023)).[3]  "Extensive skin lesions" were defined as follows:

Extensive skin lesions are those that involve multiple body sites or critical body areas, and result in a very serious limitation. Examples of extensive skin lesions that result in a very serious limitation include but are not limited to:

a. Skin lesions that interfere with the motion of your joints and that very seriously limit your use of more than one extremity; that is, two upper extremities, two lower extremities, or one upper and one lower extremity.

b. Skin lesions on the palms of both hands that very seriously limit your ability to do fine and gross motor movements.

---

[3] The listings for skin disorders were subsequently revised to remove Listing 8.06.  *See* 20 C.F.R. Part 404, Subpart P. App. 1 § 8.00.  Skin conditions such as hidradenitis suppurativa are now evaluated under Listing 8.09, pertaining to chronic conditions of the skin or mucous membranes.  20 C.F.R. Part 404, Subpart P. App. 1 § 8.09.

c. Skin lesions on the soles of both feet, the perineum, or both inguinal areas that very seriously limit your ability to ambulate.

20 C.F.R. Part 404, Subpart P. App. 1 § 8.00(C)(1) (2023) (current through Oct. 6, 2023).

Here, the ALJ gave the following reasons for finding the requirements of Listing 8.06 were not met:

> The claimant's representative repeatedly stated that the claimant had le[s]ions on her inguinal area, but the medical evidence establishes the claimant had a HS "lump" "near" her inguinal area. More specifically the record provides "There is a lump that is painful on her right anterior thigh near the inguinal region" (Exhibit 15F85). Additionally, her HS is described as Hurley stage I (which denotes mild disease). The record lacks documentation that she had 3 months of HS that seriously limited her ability to ambulate. There is some mention of pain from the HS lump, there is no mention in the medical record of HS related problems ambulating, despite there being some testimony on this issue. (Exhibits 8F, 15F58, 16F). The evidence does not establish she had or has extensive skin lesions involving both axillae, both inguinal areas or the perineum that cause problems ambulating.

(Tr. 18-19.)  As to Ms. Osborne's argument that "the ALJ failed to evaluate any evidence documenting Plaintiff's continuing outbreaks from March 2021 through September 2021 for her hidradenitis suppurativa," (ECF Doc. 7, p. 10), the above explanation explicitly references her treatment records from February, March, and September of 2021.  (Tr. 18-19 (citing Tr. 731-34 (2/4/21), 1042 (9/15/21), 1628-32 (3/14/21)).)   The ALJ was not required to discuss every piece of evidence to render a decision supported by substantial evidence.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507–08 (6th Cir. 2006) (per curiam)).  Ms. Osborne's argument that the ALJ failed to properly account for the relevant evidence is not well-taken.

As to the argument that the ALJ erred in finding the requirements of Listing 8.06 were not met, Ms. Osborne has not met her burden to show that her HS met or equaled Listing 8.06. She has not identified medical evidence establishing that she suffered "extensive skin lesions involving . . . *both* inguinal areas."  20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 8.06 (2023) (current

through Oct. 6, 2023) (emphasis added).  The medical records discuss "bumps" that were "in remission, not active lesions, only scars" (Tr. 733-34), "a couple open comedones and a couple subcutaneous nodules" (Tr. 1574-75), and an "oblong cystic plaque" (Tr. 1044), that were not always in her inguinal area and were never in both inguinal areas (Tr. 1044, 1463, 1574, 1631). As to whether the skin lesions were "extensive," the regulations describe "extensive skin lesions" as lesions in "both inguinal areas that very seriously limit your ability to ambulate."  20 C.F.R. Part 404, Subpart P. App. 1 § 8.00(C)(1)(c) (2023) (current through Oct. 6, 2023).  As the ALJ observed, the medical records do not support a finding that Ms. Osborne's inguinal lesions seriously limited her ability to ambulate.  (Tr. 18-19 (citing Tr. 731-34, 1042, 1628-32).)  Ms. Osborne also has not identified medical evidence that her extensive skin lesions persisted "for at least 3 months despite continuing treatment as prescribed."  20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 8.06 (2023) (current through Oct. 6, 2023).  Rather than demonstrating lesions persisting despite treatment, the records reflect that her lesions periodically flared (Tr. 1042-45, 1461-64) and that Ms. Osborne sometimes did not complete treatment as prescribed (Tr. 1042).

For the reasons set forth above, the undersigned finds Ms. Osborne has not met her burden to show that the requirements of Listing 8.06 were met.  The undersigned further finds that the ALJ's listings determination was adequately articulated and supported by substantial evidence.  Accordingly, the undersigned finds the first assignment of error is without merit.

**C.     Second Assignment of Error: Whether the ALJ Erred by Finding Ms. Osborne Did Not Meet Listing 11.09 After Considering Her Combination of Impairments**

Next, Ms. Osborne argues the ALJ erred in finding she did not satisfy the listing for MS because he "disregarded the symptoms related to Plaintiff's relapsing remitting multiple sclerosis," especially fatigue (ECF Doc. 7, pp. 11-12), and failed to consider psychological consultative examiner Dr. Faust's "opined limitations regarding Plaintiff's limitations with

attention, concentration, persistence, pace, and social interaction . . . which were supported by the treatment records from The Cleveland Clinic" (*id.* at p. 14).

As discussed above, Ms. Osborne bears the burden of establishing that her condition meets or equals a listing, *Johnson*, 2014 WL 1418142, at *3 (citing 20 C.F.R. §§ 404.1520(d), 416.920(d); *Buress*, 835 F.2d at 140), and "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker*, 93 Fed. App'x at 728.

To meet or medically equal the criteria of Listing 11.09, Ms. Osborne must show *either* disorganization of motor function in two extremities resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities *or* a marked limitation in physical functioning and one of the following areas: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself. *See* 20 C.F.R. Part 404, Subpart P. App. 1 § 11.09.

Although Ms. Osborne's argument is vague, her focus on MS symptoms and mental limitations suggest she is arguing that the listing was met because she had a marked limitation in physical functioning and a marked limitation one area of mental functioning. (*See also* ECF Doc. 9, p. 12.) The Commissioner responds that the ALJ sufficiently discussed Ms. Osborne's MS symptoms, including fatigue, and that Ms. Osborne "failed to satisfy her burden of demonstrating a marked limitation in physical functioning." (ECF Doc. 9, pp. 12-13.) The Commissioner further argues the ALJ's findings of moderate limitations in mental functioning were supported by substantial evidence, and that Ms. Osborne "failed to satisfy her burden to show marked impairment" in a category of mental functioning. (*Id.* at pp. 13-15.)

The ALJ articulated the following reasons to support his finding that the requirements of

Listing 11.09 were not met in this case:

> The evidence does not establish the requisites for listing 11.09 for multiple
> sclerosis, such as disorganization of motor function in two extremities resulting in
> an extreme limitation in the ability to stand up from a seated position, balance while
> standing or walking, or use the upper extremities. There is also no evidence of
> marked limitation in physical functioning and in one of the following areas:
> understanding, remembering, or applying information; interacting with others;
> concentrating, persisting, or maintaining pace; or adapting or managing oneself.

(Tr. 19.)  He later outlined Ms. Osborne's reported symptoms, as follows:

> The claimant testified that even prior to quitting her last job she was unable to do
> the work. She stated that she experienced constant back pain and migraines. The
> claimant noted that she had lesions on her legs and thighs. She reported that he
> experienced leg pain and constant fatigue. She testified that she has disturbed sleep
> and cannot tolerate a C-PAP. Mentally, the claimant testified that she has
> depression and anxiety that has increased issues with forming words and explaining
> things. She alleged difficulty concentrating and staying on task. She testified that
> she becomes exhausted when showering and feels like she is going to pass out. In
> a written submission, the claimant noted that her various symptoms have worsened
> since she applied for disability.

(Tr. 22-23.)

After outlining her subjective symptom reports, the ALJ found Ms. Osborne's statements

about the intensity, persistence, and limiting effects of her symptoms were "not entirely

consistent" with the evidence because "they are not supported by the objective medical evidence

of record that documents the extent of the restrictions caused by the claimant's combination of

impairments and her remaining functioning."  (Tr. 23.)  In support of this conclusion, the ALJ

detailed findings from Ms. Osborne's physical and psychological treatment records and the

medical opinion evidence.  (Tr. 23-26.)  The ALJ also detailed his grounds for concluding that

Ms. Osborne had moderate limitations in the four categories of mental functioning, specifically

discussing her subjective reports, her activities of daily living, and the objective findings in her

medical treatment records.  (Tr. 20-21.)

In support of her first apparent argument—that the ALJ should have found she had a marked limitation in physical functioning—Ms. Osborne cites to a single complaint of dizziness / balance issues and various complaints of fatigue in the medical records, and argues that the ALJ erred in "[f]ailing to discuss her [MS] symptoms, especially her fatigue." (ECF Doc. 7, p. 12 (citing records).) On the contrary, as noted above, the ALJ specifically discussed her symptoms and reports of fatigue. (Tr. 22-23.) He also noted Dr. Faust's observation that she "appeared fatigued and slow moving" at her psychiatric consultative examination. (Tr. 21.) The ALJ was not required to discuss every piece of evidence to render a decision supported by substantial evidence. *See Boseley*, 397 F. App'x at 199 (citing *Kornecky*, 167 F. App'x at 507-08). Ms. Osborne's argument that the ALJ failed to discuss her MS symptoms is without merit.

In support of her second apparent argument—that the ALJ should have found a marked limitation in a category of mental functioning—Ms. Osborne discusses treatment records noting her mental health symptoms and the findings of psychiatric consultative examiner Dr. Faust, and argues the ALJ erred by failing to consider Dr. Faust's opined limitations. (ECF Doc. 7, pp. 12-14.) On the contrary, the ALJ discussed Dr. Faust's objective findings and opinions (Tr. 20-21, 25) and found his opinion partially persuasive for the following reasons:

> It is supported by an expert in the field who performed a personal evaluation on the claimant. Finding that the claimant has mental limitations in occupational functioning is consistent with the overall record that documents the claimant's mental assessments, her functioning, and treatment course. However, the described restrictions by Dr. Faust are vague and not entirely consistent with occupational functioning terms.

(Tr. 25.) The characterization of Dr. Faust's opinion as "vague" is consistent with a review of that opinion, which described Ms. Osborne as having "some difficulty" and "some limitations" in specified areas of functioning. (Tr. 691-92.) Ms. Osborne's argument that the ALJ failed to consider Dr. Faust's opined limitations is without merit.

29

Ms. Osborne's limited arguments, as detailed above, are inadequate to meet her burden to show that her combination of impairments met or equaled Listing 11.09.  The required inquiry is whether the ALJ's findings were supported by substantial evidence, not whether the evidence could support greater impairment. *See Ulman v. Comm'r of Soc. Sec*., 693 F.3d 709, 714 (6th Cir. 2012).  While she has discussed some of her subjective complaints relating to her MS and her mental impairments, Ms. Osborne has not shown that the ALJ lacked substantial evidence to support his own finding that the requirements of the listing were not met.

For the reasons set forth above, the undersigned finds Ms. Osborne has not met her burden to show that the requirements of Listing 11.09 were met.  The undersigned further finds that the ALJ's listings determination was adequately articulated and supported by substantial evidence.  Accordingly, the undersigned finds the second assignment of error is without merit.

**D.     Third Assignment of Error: Whether the ALJ Erred by Failing to Properly Consider Ms. Osborne's Symptoms Under Social Security Ruling 16-3p**

Ms. Osborne also contends that the ALJ erred under Social Security Ruling 16-3p because he "failed to note Plaintiff's symptoms which were established by the medical evidence" (ECF Doc. 7, p. 18) and because his decision "failed to contain specific reasons for the finding on credibility, was not supported by the evidence in the case record and was not sufficiently specific to make clear to the individual and to any subsequent reviews the weight the ALJ gave to Plaintiff and/or the remainder of the evidence in this matter" (*id.* at p. 19 (internal citations omitted)).  In support, Ms. Osborne repeats much of her statement of facts.  (*Id.* at pp. 14-17; *compare* pp. 2-5.)  She then reasserts prior arguments that the ALJ failed to consider symptoms of MS and HS that were established by the medical evidence, including fatigue (*id.* at p. 18), and argues the ALJ failed to account for her pain (*id.* at p. 19).  The Commissioner argues in

response that "the ALJ's consideration of Plaintiff's subjective reports, pursuant to SSR 16-3p, was procedurally proper and supported by substantial evidence."  (ECF Doc. 9, p. 16.)

As a general matter, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003); *see also Alexander v. Kijakazi*, No. 1:20-cv-1549, 2021 WL 4459700, *13 (N.D. Ohio Sept. 29, 2021) ("An ALJ is not required to accept a claimant's subjective complaints.") (citing *Jones*, 336 F.3d at 476); *see also* 20 C.F.R. § 404.1529(a) and SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed Reg. 49462, 49463 (Oct. 25, 2017) (explaining a claimant's statements of symptoms alone are not sufficient to establish the existence of a physical or mental impairment or disability).

Under the two-step process used to assess the limiting effects of a claimant's symptoms, a determination is first made as to whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.  SSR 16-3p, 82 Fed. Reg. 49462, 49463; *Rogers v. Comm'r Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  SSR 16-3p, 82 Fed. Reg. 49462, 49464; *Rogers*, 486 F.3d at 247.  The analysis "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3p, 82 Fed. Reg. 49462, 49467.

When the alleged symptom is pain, an ALJ should evaluate the severity of the alleged pain in light of all relevant evidence, including the factors set out in 20 C.F.R. § 416.929(c).  *See*

*Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994).  Those factors include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. 416.929(c)(3). An ALJ need not discuss all regulatory factors he considers, only those he finds pertinent to the case. SSR 16-3p, 82 Fed. Reg. 49462, 49467.

There is no dispute that the first step is met in this case (Tr. 23), so the discussion here focuses on the ALJ's compliance with the second step.  The question is whether the ALJ adequately explained his finding that Ms. Osborne's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . because they are not supported by the objective medical evidence of record," (*id.*), and whether the evidentiary record contains substantial evidence to support those findings.

In arguing the ALJ erred in evaluating her subjective complaints, Ms. Osborne provides a general recitation of evidence followed by assertions that the ALJ "failed to note" symptoms like "fatigue and other symptoms related to her MS and HS" and evidence that she was "limited in her daily activities," (ECF Doc. 7, p. 18), and that the ALJ failed to account for Ms. Osborne's "continuing pain" (*id.* at p. 19).  These arguments are not well taken.

To the extent Ms. Osborne is seeking to reassert earlier arguments that the ALJ failed to consider her HS outbreaks or MS symptoms like fatigue, the undersigned found those arguments lacked merit in Sections VI.B. and VI.C., *supra*, that that prior analysis is incorporated herein. As discussed in Section VI.B., the ALJ referenced three different treatment visits for HS and acknowledged her complaints of associated pain before finding Ms. Osborne's skin impairment

did not meet Listing 8.06.  (Tr. 18-19.)  As discussed in Section VI.C., he also acknowledged her complaints of pain and fatigue before finding that those complaints were not fully supported by the objective medical evidence.  (Tr. 21-23.)  In his Step Three analysis, the ALJ also addressed Ms. Osborne's subjective complaints, activities of daily living, and mental status findings in reaching his conclusion that she had moderate limitations in mental functioning.  (Tr. 20-21.)

In support of his finding that the alleged intensity, persistence and limiting effects of her subjective complaints was not supported by the objective medical evidence, the ALJ discussed Ms. Osborne's medical treatment records.  (Tr. 23-24.)  He noted imagery supporting the diagnosis of MS, but with no new lesions during the relevant time period, normal physical and neurological examination findings, and a plan to initiate treatment with Ocrevus.  (*Id*.)  He noted her complaints of back pain, supported by small disc protrusions and mild osteoarthropathy, which he observed was reportedly treated with injections, pain management and physical therapy.  (*Id.*)  He detailed medications Ms. Osborne was taking for various impairments.  (Tr. 24.)  He noted a sleep study showing moderate OSA, but also that Ms. Osborne was unable to tolerate a C-PAP.  (Tr. 23.)  He noted her emergency room treatment for an abscess, which improved with treatment.  (Tr. 24.)  He noted her treatment for depressive episodes and anxiety, with a mental status examination showing tearfulness but otherwise normal findings.  (*Id.*)

The ALJ also discussed the medical opinion evidence in support of his RFC.  (Tr. 24-26.) He found the opinions of the state agency medical consultants persuasive, with the more restrictive opinion on reconsideration being most persuasive, because they were "supported with specific cites to the record in a narrative explanation" and "consistent with the claimant's physical impairment history, her treatment course, and her generally normal physical examination results."  (Tr. 25.)  He found the opinions of the state agency psychological

consultants persuasive for the same reasons.  (Tr. 25-26.)  As discussed in Section VI.C., *supra*, he found the opinion of consultative psychiatric examiner partially persuasive because the record supported mental limitations in occupational functioning but the restrictions described by Dr. Faust were "vague and not entirely consistent with occupational functioning terms."  (Tr. 25.) Finally, he found Dr. Kane's checkbox form opinion not persuasive because it was incomplete, lacked explanations, and was not consistent with Ms. Osborne's mental status examination findings and "limited and conservative mental health treatment."  (*Id.*)

The ALJ's decision thus contained "specific reasons for the weight given to the individual's symptoms," and his findings were "consistent with and supported by the evidence" and "clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16–3p, 82 Fed. Reg. 49462, 49467. While Ms. Osborne argues that the evidence supported additional RFC limitations based on her symptoms and pain, "[t]he substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts," *Blakley*, 581 F.3d at 406 (internal quotations omitted), and it is not this Court's role to "try the case *de novo*, []or resolve conflicts in evidence[.]"  *Garner*, 745 F.2d at 387.

For the reasons explained above, the undersigned finds Ms. Osborne has not met her burden to show that the ALJ erred in evaluating her symptoms or that his analysis lacked the support of substantial evidence.  Accordingly, the undersigned finds the third assignment of error to be without merit.

**E.      Fourth Assignment of Error: Whether the ALJ Erred by Failing to Resolve an Inconsistency Between VE Testimony and the DOT Under SSR 00-4p**

Ms. Osborne argues in her final assignment of error that the ALJ did not resolve an

inconsistency between the Vocational Expert ("VE") testimony and the Dictionary of

Occupational Titles ("DOT").[4]  (ECF Doc. 7, p. 21.)  Specifically, she argues:

> When the vocational witness was cross-examined, he admitted that all the jobs cited had production standards []. Furthermore, all the jobs cited had an R temperament which meant repetitive work []. At the hearing, Attorney for Plaintiff objected to the cited jobs based on the Dictionary of Occupational Titles and the fact that all carried an R temperament []. The ALJ, however, failed to rule on this objection at the hearing and in the decision stated that the testimony of the vocational witness was "consistent with the information contained in the Dictionary of Occupational Titles." []. This conclusion and finding were incorrect as an objection was made that the testimony was not consistent with the DOT []. This inconsistency was not addressed by the ALJ in his decision. Failing to address this objection at the hearing or in the decision was harmful error necessitating a remand of this matter.

(ECF Doc. 7, p. 22 (citations omitted).)  In response, the Commissioner argues that Ms. Osborne

misrepresented the hearing testimony, that the alleged conflict with the DOT "was refuted at the

hearing," and that the ALJ was not required to consider "whether apparent conflicts existed

between job 'temperaments' and the VE's testimony."  (ECF Doc. 9, pp. 18-19.)

When there is an "apparent unresolved conflict" between VE testimony and the DOT, an

ALJ must elicit a reasonable explanation for the conflict and then resolve the conflict by

determining if the VE's explanation is reasonable and provides a basis for agreeing with the

expert rather than the DOT.  SSR 00-4p, 65 Fed. Reg. 75,759 (Dec. 4, 2000).  But an ALJ is not

required to base his decision on DOT classifications, and may rely on VE testimony alone.  *See*

*Conn v. Secretary of Health & Human Servs.*, 51 F.3d 607, 610 (6th Cir. 1995) ("[T]he ALJ was

within his rights to rely solely on the vocational expert's testimony.  The social security

---

[4] Ms. Osborne asserts that this error occurred at both Step Four and Step Five of the sequential analysis, but does not contest the ALJ's finding at Step Four that she could not perform her past relevant work.  (ECF Doc. 7, p. 20.)  The assignment of error will be addressed as to Step Five alone.  (*See also* ECF Doc. 9, p. 17 n. 4; ECF Doc. 10, p. 2.)

regulations do not require the Secretary or the expert to rely on classifications in the Dictionary of Occupational Titles. 20 C.F.R. § 404.1566(d)."); *accord Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003) (finding ALJ did not err in crediting VE testimony that unskilled claimant could perform jobs classified as "semi-skilled" because the regulations do not "obligate [an ALJ] to rely on [DOT] classifications").

Here, Ms. Osborne argues that the ALJ failed to resolve two conflicts under SSR 00–4p: (1) the fact that the representative jobs identified by the VE "had production standards"; and (2) the fact that the representative jobs "had an R temperament which meant repetitive work." (ECF Doc. 7, p. 21 (citing Tr. 58-60).) Each argument will be addressed in turn.

As outlined in Section II.C.2., *supra*, the VE opined that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations in the ALJ's RFC, could perform representative positions that included garment sorter, marker, and odd piece sorter. (Tr. 55-56.) As pertinent to this discussion, the RFC required that the hypothetical individual "not [be] expected to adhere to *strict production standards such as high piece rate work*." (Tr. 54 (emphasis added).)

Ms. Osborne's first argument—that the ALJ failed to resolve a conflict arising because the representative jobs "had production standards"—lacks merit and must fail. While the VE agreed that all jobs have "production standards," he contrasted jobs that are "on a set schedule such as a production line" with jobs that are not on a set schedule but have "end-of-day goals." (Tr. 57.) When Ms. Osborne's representative conflated the terms "production standards" and "strict production standards," the ALJ cautioned him not to "put words in people's mouth[s]." (Tr. 57-58.) The VE clarified that "strict goals are generally on production lines where you have no control over the pace and amount of items that need to be completed on your line." (Tr. 58.)

36

He contrasted strict goals with jobs where tasks are supposed to be completed "on your own timeframe."  (Tr. 58-59.)  Considering this discussion, even if a conflict were shown under SSR 00-4p, the undersigned finds the VE's explanation of the difference between "production standards" and "strict production standards" was reasonable and resolved any such conflict.

Ms. Osborne's second argument—that the ALJ failed to resolve a conflict arising because the representative jobs "had an R temperament which meant repetitive work"—must also fail. Ms. Osborne's representative did argue at the hearing that the representative jobs contained "an R temperament," which pertains to "performing repetitive work or performing continuously the same work . . . according to set procedures, sequence, and pace."  (Tr. 59.)  He also objected to the jobs because an "R temperament" is inconsistent with "that."  (Tr. 60.)  The ALJ stated on the record that he disagreed with the representative's interpretation of "R temperament" and noted that the VE had given representative jobs that he believed fit the terms of the RFC.  (Tr. 59.)  Ms. Osborne's counsel did not provide further argument or explanation—on the record, through a subsequent written objection, or in her briefing before this Court—to elucidate how an R temperament is inconsistent with the terms of the RFC.

The undersigned can discern no "apparent unresolved conflict" between a DOT temperament characterizing a job as repetitive work "according to set procedures, sequence, and pace" and an RFC limiting an individual to "routine and predictable duties" without "strict production standards such as high piece rate work."  (Tr. 54.)  The ALJ's comments on the record reflect that he also did not perceive a conflict between the DOT temperament and the VE's testimony.  (Tr. 59.)  Absent an apparent unresolved conflict, the ALJ was not required to elicit a reasonable explanation or resolve the conflict by determining whether the VE's

explanation was reasonable.  SSR 00-4p, 65 Fed. Reg. 75,759 (Dec. 4, 2000).  Thus, the ALJ did not err by failing to undertake further efforts to resolve the alleged conflict.[5]

For the reasons set forth above, the record does not support a finding that the ALJ failed to comply with the requirements of SSR 00-4p.  Accordingly, the undersigned finds the fourth assignment of error is without merit.

## VII.    Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

December 11, 2023

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

---

[5] Because the undersigned finds Ms. Osborne failed to identify an apparent unresolved conflict requiring resolution under SSR 00-04p, the Commissioner's additional argument that "SSA does not consider temperaments ratings" need not be addressed herein.  (ECF Doc. 9, pp. 18-19.)